**BEFORE PUBLIC LAW BOARD 6671**

**BROTHERHOOD OF MAINTENANCE OF WAY EMPLOYES**

**and**

**NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK)**

**Case No. 4**

**STATEMENT OF CLAIM:**

1. Does Amtrak violate its May 19, 1976 Agreement with BMWE (as updated April 1, 1999) when it arranges for persons other than its own Track and B&B Departments forces to perform tree trimming and brush removal for the purpose of maintaining its right of way?
2. If the Answer to Question No. 1 above is "Yes," what shall the remedy be?

**Introduction**

By notice dated May 10, 2004, the Carrier advised the Organization of its intent to contract out the work of cutting of trees and brush along the Carrier's right of way in the Northern District of the Carrier's Northeast Corridor. The Northern District comprises the former New York, New Haven and Hartford Railroad territory. The Organization thereafter filed a claim challenging the Carrier's decision to contract out this work and asserting that the work is reserved to the Carrier's Maintenance of Way forces under the terms of the Scope Rule in the parties' Agreement. The Carrier denied the Claim.

**The Organization's Position**

The Organization initially contends that the Scope Rule does not permit the Carrier to contract out the essential track maintenance work of cutting and clearing brush and

trees on the right-of-way. The Organization argues that the Scope Rule plainly provides that track maintenance work from four inches below the base of the tie and up may not be contracted out, except in the case of emergency, without the express written concurrence of the General Chairman. The Organization asserts that there can be no question that cutting brush and trees on the right-of-way, which occurs above the base of the ties, is an essential element of track maintenance, not only to ensure proper track drainage, but also to promote safety and access by keeping the track clear of obstructions. There was no emergency in this case, so the Organization therefore insists that this work cannot be contracted out without the written concurrence of the General Chairman.

The Organization then points out that Side Letter No. 2, dated January 22, 1987, clarifies the parties' intent in the Scope Rule, to preserve work of the scope and magnitude historically performed by Organization members. The Organization therefore contends that the seminal question in this case is whether the Maintenance of Way forces performed brush and tree cutting work on the right-of-way as a matter of routine track maintenance work as of or prior to January 1, 1987. The Organization insists that its members have performed such work, as demonstrated by the many employee statements in the record.

The Organization goes on to assert that the Carrier's own qualification sheet for the Maintenance of Way Department and its website specifies that employees will clear brush and debris from the railway and will use equipment such as chainsaws and wood chippers to perform this work. Moreover, there are a large number of Third Division

awards that hold that the clearing of trees, brush, and other vegetation along the right-of-way, from property line to properly line, has customarily; traditionally, and historically been performed by Maintenance of Way forces. The Organization therefore argues that there can be no question that the Carrier violated the Scope Rule when it contracted out the performance of such work beginning on or about August 28, 2004, without the written concurrence of the General Chairman.

The Organization additionally contends that the exceptions set forth in the Scope Rule do not apply here. The Organization points out that Side Letter No. 2 expressly provides that these exceptions will not apply to work of the scope and magnitude historically performed by the Organization's members. The record in this matter unequivocally shows that Track and B&B Department employees represented by the Organization historically have and continue to perform all types of brush and tree cutting work in carrying out track maintenance work. The Scope Rule's exceptions therefore do not apply to this matter.

Addressing the Carrier's argument that the Organization has no demand right to perform the work in question on the Northern District because the work involved cutting brush and trees that interfere with the catenary system, and therefore accrues to IBEW-represented forces, the Organization insists that this assertion is wrong. The Organization maintains that the Carrier has not and cannot show that the primary work involved cutting trees or brush from the catenary lines. Instead, the record shows that contractors performed general right-of-way clearing work, and the work of cutting trees or brush

from the catenary lines was incidental.

The Organization also points out that even if IBEW-represented forces have a contract right to perform some brush clearing work, this is irrelevant because this case does not involve a craft dispute between IBEW and BMWE. The Organization asserts that the parties also recognize the possibility of overlapping jurisdiction between the crafts. Moreover, the Organization emphasizes that the Carrier ignored both the BMWE and IBEW Agreements and assigned the work to outside contractors. The Organization asserts that the NRAB consistently has held that a craft's inability to prove exclusive jurisdiction between itself and another craft does not give the carrier the right to disregard its obligations to both crafts and assign the work to an outside contractor.

The Organization then points to the parties' bargaining history. The Organization maintains that in 1987, the Carrier wanted to be freed from the 1980 Minimum Force Agreements, so the Organization ultimately agreed to this in exchange for scope language that would maintain the bargaining unit's vitality by guaranteeing that scope-covered work could not be contracted out except under very limited circumstances. The Organization insists that if the Carrier could contract out fundamental track maintenance work by the simple expedient of asserting overlapping craft jurisdiction, then the entire *quid pro quo* inherent in the January 5, 1987, Agreement would be a sham. The Organization contends that it did not surrender the Minimum Force Agreements for such a hollow promise.

The Organization goes on to argue that the proper remedy in this case is to return

PLB NO. 6671

Case NO. 4

the work in question to Track Department forces, and to compensate the appropriate Track Department forces at their applicable rates of pay for the man-hours expended by the contractor's forces in performing the work. The Organization ultimately contends that the instant claim should be sustained in its entirety.

**The Carrier's Position**

The Carrier initially contends that the work in dispute is not reserved to the craft under the contract. Tree and brush cutting is not specifically mentioned in the Scope Rule, and the Carrier insists that the Organization fully recognized this fact when the language of the Scope Rule was agreed upon.

The Carrier points out that because the Organization had performed brush cutting in the past and sought to continue to participate in such work, the parties entered into a letter agreement on the issue. The Carrier asserts that this letter agreement confirms the Carrier's intent to not cease using Carrier employees on general right-of-way clean-up and brush cutting. The Carrier maintains that the letter agreement makes it clear that such work is not of the type that may be contracted out only with the Organization's written concurrence. The Carrier argues that had the parties intended to add such work to the Exceptions set forth in the Scope Rule, then the letter agreement would have stated that intent. Instead, the letter agreement makes clear that the parties made no guarantee of performance rights to such work.

The Carrier emphasizes that the Organization's entire case is premised on the allegation that its members traditionally have performed the work in question. The

PLB NO. 6671

Case NO. 4

Carrier insists, however, that past practice cannot and does not alter clear and unambiguous contractual language. The Carrier argues that tree and brush cutting do not fit within the exceptions to the Scope Rule. Moreover, the parties fully recognized that the work of clean-up and brush cutting on the general right-of-way is not reserved to the craft.

The Carrier maintains that the Board must not add to or rewrite the parties' language, but instead must take the most obvious meaning of that language. The Carrier contends that the subject letter does not place general right-of-way clean-up and brush cutting, let alone tree cutting, under the exceptions to the Scope Rule that would prohibit contracting out such work without the Organization's concurrence. The Carrier additionally argues that although the Organization has asserted that its members historically have performed brush cutting on the territory in question, the record demonstrates that they never have performed brush cutting and/or tree cutting in connection with the catenary system. The Carrier contends that there is no basis for the Board to now award the Organization with rights to work that they never performed.

The Carrier goes on to assert that the scope of the work in question far exceeds the "brush cutting" contemplated in the January 5, 1987, Side Letter. The Carrier insists that its equipment is designed and utilized for cutting "brush" – vegetation and small trees along the right-of-way that may directly interfere with train movements. The Carrier maintains that this equipment is not designed or intended for the removal of trees such as those depicted in the Organization's photographs. The Carrier further contends that there

is no dispute that it has contracted out the cutting of trees where the scope of the project necessitates the use of forces skilled in safe and efficient tree removal. This contracting out of tree cutting demonstrates that this work is not reserved to the craft by practice, much less by contractual language. The Carrier argues that it is not precluded from contracting out this work without the Organization's concurrence.

The Carrier points out that where, as here, there is a history of contracting out disputed work, such work cannot be characterized as work reserved to the craft under the Scope Rule. The work at issue was, at most, a shared function, and not work reserved to the Organization, as shown by the fact that the January 5, 1987, Side Letter expressly recognized that other crafts may perform the work.

The Carrier then contends that the simple fact that it notified the Organization of its intent to utilize outside contractors is neither an admission nor evidence that the work is covered by the Scope Rule. The Carrier points out that there is a long history of outside forces and other crafts cutting brush, so this clearly is not work reserved to the craft under the Agreement's Scope Rule. The Carrier insists that it is not prohibited in any manner from contracting out the work in question.

The Carrier goes on to assert that the work in dispute was necessary to prevent power outages and damage to the catenary system, so this is not work that would accrue to the craft in this territory under the Agreement. The Carrier points out that the catenary electric traction system on the New England Division is maintained by IBEW forces. The Carrier argues that the function of cutting trees and brush is incidental to the maintenance

functions, and this work can be performed by any number of crafts. The Carrier further maintains that performing such work to prevent power outages and minimize potential damage to the catenary system is incidental to the maintenance work that accrues to the IBEW in this territory.

The Carrier then emphasizes that there is no contract language to support the Organization's assertion that its forces have rights to the disputed work ahead of outside forces simply because they have cut brush in this territory in the past. In fact, prior to the electrification of the Northern District in the early 1990s, there was no catenary system from which to cut trees and brush. The Carrier therefore asserts that the Organization's past brush cutting was incidental to general right-of-way maintenance, to prevent vegetation from interfering with train operations. The Carrier insists that it recognized that some of the brush and trees to be cut in this project was not directly related to protection of the catenary system, so the Carrier agreed to assign two Organization members to assist with this brush cutting and chipping.

The Carrier argues that there was no effort to diminish the Organization's work, and the instant claim is an attempt by the employees to obtain a modification to the Scope Rule and the January 5, 1987, Side Letter that would afford them exclusive rights to the work. The Carrier insists that this attempt must be rejected, and the instant claim denied in its entirety.

**The Organization's Rebuttal**

In rebuttal, the Organization argues that the Carrier is wrong in asserting that the

work in question is not covered by the Scope Rule. The Organization points out that it is well established that vegetation control is an essential part of track maintenance operations, so this work may not be contracted out without the written concurrence of the General Chairman.

In further rebuttal, the Organization insists that the Carrier has frivolously asserted that past practice has no force or effect in this case. The Organization maintains that under well-established principles of contract interpretation, the parties have provided that past practice controls the interpretation and application of the Scope Rule. The Organization argues that past practice as of January 1, 1987, or prior thereto, is a critical factor in this dispute, and BMWE members historically have performed brush and tree cutting and clearing during this controlling time frame.

Continuing its rebuttal, the Organization contends that the Carrier is unambiguously wrong in its assertions regarding Side Letter No. 1. The Organization emphasizes that this Side Letter does not control the reservation of work to BMWE-represented employees, but instead creates an exception to that work reservation with respect to other crafts. The Organization argues that Side Letter No. 1 actually demonstrates that when the parties intended for anyone other than BMWE members to perform right-of-way clearing work, they expressly stated that "other employees," and not outside contractors, could perform the work.

Also in rebuttal, the Organization maintains that the Carrier is wrong in asserting that the work at issue is beyond that intended by the Agreement. The record demonstrates

PLB NO. 6671

Case NO. 4

that BMWE-represented forces historically have cleared all types of vegetation from the right-of-way, including large trees in the vicinity of the catenary wires. Moreover, the Carrier's reliance on the so-called exclusivity test is invalid here because there is no contractual reference to exclusive past performance, because it is inconsistent with the meaning and plain language of the Scope Rule, and because the NRAB has held that the exclusivity test has no application to contracting out disputes. The Organization emphasizes that its General Chairman, in a showing of good faith, twice allowed the Carrier to contract out such work in 1994 in exchange for the Carrier's commitment to obtain the necessary equipment and assign BMWE members to perform the work in the future. The Organization argues that the Carrier therefore has violated these commitments, in addition to the Scope Rule and Side Letter No. 2.

Continuing its rebuttal, the Organization contends that the Carrier is wrong in asserting that the fact that the Carrier notified the Organization of its intent to utilize outside contractors is neither an admission nor evidence that the work is Scope-covered. The Organization points out that such notice is required only where the Carrier plans to contract out work within the scope of the Agreement. The Carrier's notice therefore represents a tacit admission that the work at issue is within the Scope of the Agreement. As for the Carrier's assertion that the work in question accrues to IBEW forces, the Organization emphasizes that IBEW never has claimed this work, so the Carrier simply has the facts wrong. The Organization contends that the instant claim should be sustained in its entirety.

**The Carrier's Rebuttal**

In its own rebuttal, the Carrier contends that the work in question is not reserved under the Scope Rule. The Carrier points out that the Organization sought an agreement that would enable its members to participate in such work, with the result being Side Letter No. 1. The Carrier further asserts that past practice cannot be used as a basis for adding to or rewriting the language of the parties' Agreement. The Carrier insists that neither the Scope Rule nor Side Letter No. 1 places the work in question under the exceptions that would prohibit contracting out without the concurrence of the General Chairman.

In further rebuttal, the Carrier emphasizes that the work in question involved the large trees growing into and over the catenary system, work of a far greater scope than that generally assigned to BMWE employees. The unrefuted history of contracting out tree cutting demonstrates that this work is not reserved to any craft, so the Carrier is not restricted from utilizing outside contractors as deemed necessary based on the scope of the project and service requirements. The Carrier insists that the work in question primarily was to clear trees from the catenary system, not to prevent vegetation from interfering with train movements or for proper track drainage. The Carrier contends that the instant claim should be denied in its entirety.

The parties being unable to resolve their dispute, this matter came before this Board.

**Findings**

The instant matter is one in a series of similar claims that the Organization has pursued over the Carrier's decisions to contract out certain work to outside contractors. This case centers on the work of cutting trees and brush along the Carrier's right of way in the Northern District of the Northeast Corridor. More specifically, the Carrier contracted out the work of tree trimming and removal in and around the catenary wires and structures on the New England Division. The Organization essentially asserts that this work is of a type that the Carrier may not contract out, except in an emergency, without the express written concurrence of the General Chairman, while the Carrier counters that the work is not reserved to the maintenance of way craft and it may be contracted out without the General Chairman's concurrence.

As this Board has found in the prior cases between these parties on the contracting out of work, the Scope Rule found in the parties' Agreement, when read in conjunction with Side Letter No. 2, emphasizes that work of the scope and magnitude historically performed by BMWE forces is to be preserved for the craft. As the Organization points out, the "Exceptions" provision within the Scope Rule expressly states that certain types of work may not be contracted out without the General Chairman's written concurrence, with such protected work including track inspection, maintenance, construction or repair from four inches below the base of the tie and up.

The Carrier is correct that neither the Scope Rule nor Side Letter No. 2 specifically refers to the cutting of trees and other brush from in and around the catenary system, but

this does not necessarily mean that this work is not covered by the Scope Rule. The Scope Rule necessarily describes the work that it covers and protects in more general terms. It would be wholly impractical to expect that this contractual provision will describe, in minute and precise detail, each and every type of work that it covers, in all possible forms and varieties. To impose such a requirement upon the Scope Rule would mean that this provision would mean re-writing the parties' Agreement, something that this Board has no power to do, and it would result in an almost infinitely lengthy Scope Rule. The general language of the Scope Rule, as written, broadly defines the range of covered work, with the maintenance of track, the general right of way, and the catenary system expressly included therein. This Board finds that there can be little serious question that the cutting of trees and brush from in and around the catenary system must be considered as included within the maintenance work broadly described in the Scope Rule.

The record in this matter further demonstrates that Maintenance of Way forces historically have performed tree and brush cutting work on the territory in question, although not necessarily in connection with the catenary system. In fact, there appears to be no dispute between the parties about this. Moreover, the record demonstrates that the instant matter is not the first time that the contracting out of tree cutting work relating to the catenary system has been at issue between the parties. The record includes correspondence between the parties relating to past instances in which the Carrier has sought to contract out this very same type of work. This correspondence is particularly

helpful in this Board's analysis of the instant dispute. In August 1994, for example, the parties exchanged correspondence, negotiated over, and ultimately reached an agreement on the Carrier's stated intent to contract out the work of trimming trees encroaching on the catenary system on the former Philadelphia Division. This 1994 agreement specified that both parties intended for the Carrier's employees to perform such work in the future, even as the parties agreed to allow the contracting out at that time, and the Carrier expressly committed itself to acquiring the equipment necessary to allow its own employees to perform this work.

This Board finds that the language of the Scope Rule and the parties' historic handling of the contracting out of this exact same type of work in the past demonstrate that the parties understood that the work of trimming trees from in and around the catenary wire system does fall within the range of work protected by the Scope Rule. We hold that this evidence of the parties' prior handling of this very same type of work in 1994 conclusively shows that the parties understood, agreed, and intended that the work in question would be considered protected by the Scope Rule. Accordingly, we find that the Carrier must negotiate with and obtain written concurrence from the General Chairman if it wishes to contract out the work of trimming trees from in and around the catenary system.

The Carrier's reliance on Side Letter No. 1 is misplaced. Side Letter No. 1 emphasizes the Carrier's intent that Maintenance of Way forces shall continue to perform general right-of-way clean-up work and brush cutting, although it does not prohibit the

Carrier from assigning such work to other of its employees. Essentially, Side Letter No. 1 establishes that the Maintenance of Way forces do not have exclusive rights to this work among the Carrier's different groups of craft employees. The Organization in this case agrees with that. This Board also agrees that the rights involved here are not exclusive to the Brotherhood of Maintenance of Way. The International Brotherhood of Electrical Workers also may have some or all of the same rights. The rights of the International Brotherhood of Electrical Workers are not before this Board in this case. The issue here is whether the Carrier has the right to subcontract the brush cutting work involved in this case before it obtains the agreement of the General Chairman of the Brotherhood of Maintenance of Way Employees. It should be noted that Side Letter No. 1 does not apply to situations involving the contracting out of the work described therein, but instead addresses only the question of which of the Carrier's own employees may perform the work. Those are two very different issues. This Board is not deciding the relationship of the rights that may or may not be held by the International Brotherhood of Electrical Workers vis-a-vis the Brotherhood of Maintenance of Way Employees. This Board is narrowly deciding only the issue of the subcontracting of the tree trimming and brush removal work as it impacts the Brotherhood of Maintenance of Way Employees and the Carrier.

As this Board previously has found in the earlier cases, in addition, the exclusivity test also does not apply to disputes over the contracting out of work. The exclusivity test has been applied to disputes between a single carrier's different craft employees, but this

test has no bearing on disputes over the contracting out of work, as established by the overwhelming weight of Board decisions. Accordingly, we find that the fact that the Maintenance of Way forces do not have exclusive rights to the work in question is not relevant to the resolution of the instant dispute over contracting out. As previously noted, the Organization has satisfied its burden of showing that its forces historically have performed work of this scope and magnitude; the Organization does not have to demonstrate exclusive rights to this work.

The Carrier also has argued that the reasons why this work was necessary, to prevent power outages and damage to the catenary system, indicate that this is not work that would accrue to the craft in this territory. The Carrier's argument on this point, however, finds no support in the parties' Agreement or in the evidentiary record. The Scope Rule does not include maintenance work only so long as it is done for a specific purpose. Quite simply, the Scope Rule refers to maintenance work on the track, the general right-of-way, and the catenary system as being covered, without regard for the reason(s) why any such work might be necessary.

The evidence in the record as to the prior instances in which the Carrier contracted out this type of work shows that both sides historically have treated this work as falling within the range of work described in the "exceptions" section of the Scope Rule, meaning that such work may be contracted out only with the General Chairman's written concurrence. Indeed, in 1994, the Carrier sought and eventually received the General Chairman's written concurrence before subcontracting this same type of work. Nothing

in the record suggests that the instant situation should be treated in a different manner. Instead, the Carrier's prior written commitment to obtaining the equipment necessary to allow its own employees to perform the work, as expressed in part in the 1994 Fagnani correspondence entered into the record, emphasizes that the instant work is covered by the Scope Rule, and the Carrier therefore had no authority to contract out the work without the General Chairman's written concurrence.

There is no evidentiary basis for any finding that the situation at issue involved an emergency or that the work could not have been completed in a timely fashion by the Carrier's own forces. Given the documented evidence relating to the Maintenance of Way forces' history of performing tree cutting and brush cutting work, it is clear that these employees possess the skills, training, and experience necessary to properly and safely perform the work in dispute. Moreover, the record indicates that the Carrier already owns, or could have timely leased, between 1994 and 2004, whatever equipment was necessary to perform the tree cutting and trimming work in question. Fagnani made that promise in his letters and the record contains invoices showing that Amtrak has obtained the equipment.

One part of the Organization's argument here requires additional comment and must be rejected. The Organization has asserted that the Carrier's notice of its intent to contract out the work in dispute constituted an admission that the work is, in fact, covered by the Scope Rule. This Board has found that the work is covered by the Scope Rule, but the reasons and evidence that support this finding do not include the fact that the Carrier

gave such notice to the Organization. If particular types of work are to be considered Scope-covered solely because the Carrier has extended to the Organization the courtesy of giving notice of its intent to contract out such work, without regard for the language of the Rule and the historical practice relating to the work, then the Carrier would have little reason to ever notify the Organization of its intent to contract out work, except in those situations to which the Scope Rule unquestionably applies. We hold that a notice of the Carrier's intent to contract out work does not, by itself, establish that work as being covered by the Scope Rule, and such notice cannot be considered as either an admission or conclusive evidence that the work referenced in the notice is covered by the Scope Rule.

In accordance with the language of the parties' Agreement and the competent, credible evidence in the record, this Board finds that the work at issue, consisting of trimming and removing trees and brush from in and around the catenary system, is covered by the Scope Rule, and the Carrier therefore did not have the authority to contract out this work without the General Chairman's written concurrence. The instant claim therefore must be sustained.

With respect to the remedy, this Board must find that the Carrier is required to reimburse at the straight-time rate the applicable maintenance of way employees for the work that they should have been allowed to perform but was instead performed by the outside contractors.

PLB NO. 667 Case NO. 4

**Award**

The claim is sustained. The Carrier violated the agreement when it arranged for persons other than its own Track and B&B Department forces to perform tree trimming and brush removal for the purpose of maintaining its right of way. The Carrier is required to reimburse at the straight-time rate the applicable maintenance of way employees for the work that they should have been allowed to perform but was instead performed by the outside contractor.

PETER R. MEYERS
Neutral Member

ORGANIZATION MEMBER

DATED: January 17, 2006
Response to Dissent Attached

CARRIER MEMBER

DATED: February 9, 2006
DISSENT ATTACHED

# Amtrak's Dissent to Award 4 – PLB 6671

The issue before the Board, as acknowledged in the findings, was whether Amtrak violated the BMWE agreement by utilizing contractors to cut trees from the catenary system in New England. The majority in this case elected not to interpret existing agreements, but to change them, while also acknowledging the BMWE does not have exclusive rights to the disputed work.

The Board has clearly exceeded its authority by amending Scope Rules to give BMWE rights to work they never performed. The Board also exceeded its authority by eliminating Side Letter No. 1 and placing brush cutting under the Exceptions to the Scope Rule which that letter specifically did not do.

Side Letter No. 1 dated January 5, 1987, states that it is Amtrak's intent "to continue performing general right of way clean-up work and brush cutting with employees who are members of the Brotherhood of Maintenance of Way Employes. However, it is not the Carrier's intention by this letter to prevent other employees from performing the foregoing work if related to, or incidental to, the performance of work associated with their positions." The majority decided to change this letter to provide that brush and tree cutting is work reserved to the BMWE which, further, cannot be contracted out without written concurrence of the General Chairman. If that is what the parties had intended by the letter, that is what they would have written.

More distressing is the fact that the majority elected to amend scope rules by granting BMWE rights to work associated with catenary maintenance on the New England Division. The majority comes to this decision despite the admitted recognition of both Amtrak and the BMWE that work in connection with the catenary system in this territory accrues to the IBEW. As the union well knows, the BMWE Agreement specifically excludes scope coverage of catenary work on the "Northern District" which is the area here.

There was never a dispute that BMWE participates in brush cutting. This issue before the Board, as stated above, was whether Amtrak violated the BMWE agreement by utilizing contractors to cut trees from the catenary.

It is a recognized principle that tree and brush cutting work can be and is performed by a number of crafts. It is also well recognized that in cases involving such shared tasks, when outside forces are used, the relevant contract provisions of the craft to which the work accrues must be applied. For example, in NRAB Third Division Award 35529, involving one of several disputes over the use of contractors to cut trees and brush, Referee Benn ruled:

> "For the most part, the cases presently before us involve the Carrier's use of contractors to perform brush cutting work. From a practical standpoint, the contractor did not distinguish between work allocated to BMWE and BRS – the contractor simply moved down the right-of-way and cut brush. Thus, to award

monetary relief to BRS employees where the contractor performed cutting of brush which, while interfering with signal or communications lines and related equipment, also involved other brush cutting along the right-of-way to which BRS employees have no legitimate claim, would amount to a windfall to those employees. To make a similar monetary award to BMWE employees for work over which they have no legitimate claim would have the same effect."

At page 13 of this decision, the majority opined:

"This Board finds that there can be little serious question that the cutting of trees and brush from in and around the catenary system must be considered as included within the maintenance work broadly described in the Scope Rule."

Yet the majority elects to ignore the fact that with respect to catenary-oriented tree and brush removal, the applicable scope rule is that of the IBEW, not the BMWE.

In the instant case, Amtrak served notice on both the IBEW and the BMWE of the intent to utilize outside contractors to cut trees away from the catenary system. The IBEW did not protest Amtrak's plan. The BMWE protested and only because some of the work could involve brush cutting along the right of way rather than from catenary, which might arguably accrue to BMWE, Amtrak agreed to assign two additional BMWE employees to the project to perform work accruing to the craft.

While the Board contends that Amtrak provided no evidentiary support that catenary maintenance does not accrue to BMWE in New England, there is no need for Amtrak to prove what is admitted and not contested. More importantly, the burden of proof is on the petitioner to prove they have that right, not on Amtrak to prove the negative. The BMWE did not prove nor did they even contend that they ever cut trees from catenary in New England. This issue was never contested because it is a contractual fact – catenary work on the New England Division accrues to IBEW.

Despite the fact that work in connection with the catenary system in New England accrues to the IBEW, despite the fact that BMWE never cut trees away from the catenary system in this territory, and despite the fact that BMWE employees were assigned to the project to perform work accruing to BMWE in the territory, the majority chose to rely on prior settlements of brush cutting disputes on totally separate and different territory where catenary work is performed by BMWE, not by IBEW, to conclude that Trackmen and Bridge & Building employees have rights to this work on the catenary on the New England Division. The fact is, there was no catenary on the New England Division until the late 1990's, well after the January 5, 1987, Side Letter. The settlement letters relied upon by the majority involve a different General Chairman, with jurisdiction in the Southern District where catenary-related work does accrue to the BMWE.

The decision in this case is not based on fact as BMWE employees in New England have no experience in cutting trees from high voltage lines, nor did they demonstrate the work was performed by BMWE on the New England Division as of January 1987. Therefore,

it is not work reserved to them under the existing Scope Rule. To give BMWE rights to work accruing to IBEW and the right to claim that work for itself is a change of the agreements, not an interpretation of existing language. In fact, this flies in the face of factual agreement jurisdictions and established arbitral precedent as cited above.

The award violates every principle of arbitration and contract law, by determining work jurisdiction without seeking or obtaining input from crafts such as IBEW and BRS that have a vested interest in the work and, therefore, this decision, who now stand to suffer loss of work rights because of the assignment of rights to all brush and tree cutting to BMWE, regardless of whether it is related to track interference, signal interference, communication interference or catenary interference.

The fact remains that BMWE does not have rights to maintenance of the catenary on the New England Division nor to cut trees and brush from that system, and Amtrak did not violate the contract as BMWE forces were assigned to the project for the performance of work accruing to the craft. Amtrak will not be guided by this erroneous decision in future work involving these parties but will seek to respect the historic equities.

With respect to damages, we note that both the majority and BMWE acknowledge other crafts have equity in the work. As such, Amtrak believes it protected BMWE's equity in general right of way tree and brush removal when Amtrak assigned two BMWE represented workers to do such arguably related work in a project admittedly predominantly catenary clearing related. Any error to proceed with the contractor under the BMWE agreement cannot extend to work where the equity admittedly lies elsewhere.

As the Board clearly exceeded the scope of its authority, Amtrak vigorously dissents to the contract interpretation judgments in the decision, which clearly amends rather than interprets agreements.

R. F. Palmer
Carrier Member
February 7, 2006

Labor Member's Response
To
Carrier Member's Dissent
To
Award 4 Of Public Law Board No. 6671

In a transparent effort to blunt the precedential value of the well-reasoned Findings and Award of the Majority, the Carrier Member has misstated the facts of record, the arbitral precedent and the plain terms of the collective bargaining agreement in a petulant diatribe masquerading as a dissent. If future readers accept the inexorable logic that the precedential value of an award is proportionate to the clarity of reasoning in the award, then Award 4 of Public Law Board No. 6671 will carry powerful precedential value. The fact is, that this was a straightforward contract interpretation case and there was nothing unique about the facts of the case or the principles employed in deciding the case that would undermine the precedential value of this carefully reasoned award. Indeed, with respect to the principles employed in deciding the key work reservation and overlapping jurisdiction issue between BMWE and the IBEW, Award 4 of PLB No. 6671 is entirely consistent not only with prior precedent on this property, but similar awards on other carriers throughout the nation. Likewise, the remedy is consistent with literally hundreds of awards concerning the improper siphoning of work from the bargaining unit, including prior awards on PLB No. 6671.

With respect to the facts, the record inexorably established that BMWE-represented forces customarily and historically performed the work of mowing and cutting brush and trees on the right-of-way from property line to property line, including areas where catenary and signal wires ran overhead. Indeed, it would be absurd to even suggest that, when BMWE-represented forces were mowing and cutting brush and trees to keep the right-of-way clear, they should skip areas where catenary or signal wires ran overhead thereby allowing vegetation to not only obscure the right-of-way, but to grow into the wires as well. Of course, they did no such thing. Rather, as the documentary evidence plainly demonstrated, both before and after the pivotal date of January 1, 1987, BMWE forces mowed and cut brush and trees anywhere they grew on the right-of-way, from property line to property line, including under and around overhead wires.

The Carrier Member's attempt to distinguish between the Southern District and the New England Division of the Northern District is a distinction without a difference. No one disputes that the New England Division was not electrified until the 1990's and, therefore, there were no catenary wires before that time. Nor is it disputed that IBEW forces have maintained the catenary system on the New England Division once it was electrified. However, it is equally undisputed that prior to the installation of the catenary wires, BMWE-represented forces mowed brush and cut trees across the

entire right-of-way from property line to property line on the New England Division. The fact that catenary wires were installed above the right-of-way in the 1990's could not serve to remove the brush and tree cutting work under the wires from the Scope of the BMWE Agreement anymore than it could serve to remove the work of operating locomotives under the wires from the Brotherhood of Locomotive Engineers.

Moreover, it is critically important to note, as the Majority did, that the dispute decided by Award 4 was based on the contracting out of brush and tree mowing and cutting work and did not involve an inter-craft jurisdictional dispute between BMWE and IBEW. In keeping with well-established precedent, not only on this Board but throughout the industry, the Majority correctly held that the fact that two or more crafts may have overlapping jurisdiction on certain work does not permit a carrier to ignore the collective bargaining agreements of all of the crafts and contract out the work. Consequently, to the extent that IBEW forces (or for that matter BRS forces) may have contract rights to cut brush or trees around overhead wires on the Northern District, those rights are not affected by Award 4 of PLB No. 6671. The Majority was crystal clear on this point and the Carrier Member's assertions to the contrary are disingenuous at best.

Likewise, it is disingenuous for the Carrier Member to complain that IBEW had a "vested interest" in this work and was unfairly denied "input" in this case. As the Carrier Member plainly states at Page 2 of his Dissent, Amtrak notified IBEW, in advance, of its intention to contract out the work in question and the IBEW expressed no interest in performing the work. Consequently, IBEW had no "vested interest" because it plainly was given the opportunity for "input" and it plainly indicated it had no interest in performing the work.

In conclusion, it is clear that the Board did not exceed the Scope of its authority in Award 4. Rather, the Board applied hornbook principles of contract interpretation to interpret and apply the Scope Rule in a well-reasoned and clearly written award that is fully consistent with prevailing precedent on each and every key point.

Respectfully submitted,

Jed Dodd
Labor Member

March 3, 2006